# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## STATE OF TENNESSEE v. ANGEL MANUEL RIVERA

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3057    Monte Watkins, Judge**

---

**No. M2013-01810-CCA-R3-CD - Filed September 16, 2015**

---

A Davidson County Criminal Court Jury convicted the appellant, Angel Manuel Rivera, of first degree felony murder, second degree murder, attempted especially aggravated robbery, and three counts of aggravated assault. After merging the murder convictions, the trial court imposed a total effective sentence of life plus five years. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's denial of his motion for a judgment of acquittal, the trial court's permitting witness testimony about the appellant's character, and the trial court's failure to allow counsel to withdraw prior to trial. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Eugenia Grayer, Nashville, Tennessee (on appeal), and Paul Walwyn, Madison, Tennessee (at trial), for the appellant, Angel Manuel Rivera.

Robert E. Cooper, Jr., Attorney General & Reporter; Clark B. Thornton, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Deborah Housel and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

A Davidson County Grand Jury returned a multi-count indictment against the appellant, charging him with the first degree felony murder of James Wade, the first degree

premeditated murder of James Wade, the especially aggravated robbery of James Wade, the aggravated assault of Kira Ford, the aggravated assault of Kourtney Bearden, and the aggravated assault of Michael Sullivan. The charges stemmed from a home invasion that occurred on July 9, 2009.

At trial, Kira Ford testified that on July 9, 2009, she was living in the Hermitage area of Nashville with her boyfriend, James Wade; Kourtney Bearden; and Michael Sullivan. Ford said that Wade and the appellant had been friends for years. The appellant frequently came by their residence to visit and had attended a party they had on July 4, 2009.

Ford said that on July 9, 2009, she and Wade were in the back bedroom when they heard Bearden and Sullivan, who were in the living room, announce that the appellant had arrived. Wade walked into the living room to see the appellant. The appellant brandished a gun at Wade, Bearden, and Sullivan. Ford, who had been following a few steps behind Wade, saw the appellant with the gun and began to retreat toward the bedroom. Two men who were with the appellant stopped her and made her walk into the living room. She could not recall if the men with the appellant touched her. The men made Ford sit on the couch with Wade; Bearden and Sullivan sat on another couch facing them. The victims began screaming and begged the appellant to stop pointing the gun at them, but he ignored them.

Ford said that one of the men with the appellant was wearing a hunting mask, and the other had a bandana covering the bottom part of his face. Ford did not think they were armed. All of the appellant's clothing was black, and he was wearing a black hat; however, his face was not covered. While the appellant kept a gun pointed at the residents, the two men went to other rooms in the house. Ford did not know what they were doing; her attention was focused on the gun.

Ford recalled that Wade stood up from the couch, asked the appellant what he was doing, and told the appellant that he would call the police when the appellant left. The appellant said, "I know you are." Wade said, "I can't believe you're doing this, you have been my friend for so many years." The appellant pointed the gun directly at Wade, and Ford begged Wade to return to his seat on the couch. Wade asked the appellant to stop and took one step forward. The appellant told Wade to sit down, and when he did not comply, the appellant shot him. Wade fell immediately to the floor.

Ford said that after the shot was fired, the two men accompanying the appellant returned to the living room, and all three men ran out of the house. Ford ran to the door, locked it, and called 911. She then went to Wade, who was lying face-up on the floor, and held him until the paramedics arrived. Wade was not bleeding much, but Bearden got a towel to place on his wound. Wade began turning blue, and Ford shook him to keep him

awake. Shortly thereafter, an ambulance arrived and transported Wade to Vanderbilt Hospital. Ford called Wade's mother and told her of the incident. The police arrived and spoke with Ford, Bearden, and Sullivan. The police then took them to the Hermitage precinct for further questioning. Ford told the officers that the appellant shot Wade. While at the precinct, Ford received a call from Wade's mother, informing her that Wade had passed away. A few days later, the police showed Ford a photograph lineup, from which she positively identified the appellant.

Ford said that after the incident, she went to the bedroom and saw that some drawers had been opened, a wooden box had been turned over, and other items had been tossed around the room. She noticed that Wade's wallet, cellular telephone, and coins he had collected were gone. Her iPod and forty dollars were also missing. On the bed, Ford found an empty wooden box in which they had kept movie tickets.

Ford acknowledged that Wade had been growing a couple of marijuana plants in the closet. She said that he smoked marijuana but that he was not a drug dealer.

Ford told Detective Jennings that two men had been to the house with the appellant a couple of nights before the incident and that she thought they were the men who were with the appellant on the night of the incident. Ford explained that the men were "tall and skinny . . . [with] a lot of tattoos," just like the men she had seen previously with the appellant.

On cross-examination, Ford said that she and Wade rented the house from Wade's parents. They had lived at the residence for approximately two years. Bearden and Sullivan, who were unemployed, had lived with them rent-free for less than two months. Ford said that the appellant did not have any problems with her or Wade.

Ford recalled that when the two men came to her house with the appellant a couple of days before the offense,

> [t]hey didn't want to come inside and they weren't speaking a
> lot to me. They were reluctant to give me their names, and they
> looked down a lot. They were – didn't seem like very
> trustworthy people to me.

Ford said that on the night of the incident, the appellant acted "angry, like he was going to rob us and kill us." She had never seen the appellant behave that way. She estimated that the entire incident lasted three to five minutes. Ford did not see the appellant ask anyone for their property or take anything from the house. She said that Wade took a "[p]retty slow step" toward the appellant. Wade was not wearing a shirt and did not appear

threatening.

Michael Patrick Sullivan testified that on July 9, 2009, he and his then-girlfriend, Bearden, had been living in the basement of Wade's house for approximately one month. During that time, the appellant had been to Wade's house three or four times, including attending a Fourth of July party. On the evening of July 9, Sullivan and Bearden were in the living room watching television, and Wade was in the shower. Sullivan did not know where Ford was. Sullivan said that they had left the front door "wide open." The appellant "poked his head in the door" and asked for Wade. Sullivan yelled for Wade then went to inform him of the appellant's arrival.

Sullivan said that when Wade came into the living room, the appellant pulled out a small, black handgun, possibly a nine millimeter. Sullivan did not know where the appellant had concealed the gun. At the appellant's behest, Ford also came into the living room. The appellant pointed the gun at each of them. Fearing for his life, Sullivan tried to be compliant. After the victims sat down, the appellant called two men into the house. The men did not appear to be armed. While the appellant kept a gun pointed at the victims, the two men began rummaging through the house. Sullivan said that he did not know the men and that he did not see their faces clearly; however, he recognized them as "skinnier white males" from the neighborhood who had been to the house with the appellant on July 4.

Sullivan said that he felt threatened but could not recall anything the appellant said. Sullivan recalled that Wade was angry that strangers were in his house, taking his things. Wade encouraged the appellant to leave, then they started "bickering," and the situation "escalated." When Wade stood and took a step toward the appellant, the appellant shot Wade. Sullivan said that the appellant "aimed low. I don't believe it was, like, a fatal intended shot, like something in the head, or something to end quickly." Sullivan did not know the extent of Wade's injuries, noting that "it was a lower stomach shot" and that "in the movies they always make it on a shot like that."

Sullivan said that after the shooting, the appellant's accomplices left. The appellant stayed, "cycling the gun around . . . [wav]ing it around at us." Sullivan thought the appellant intended to kill them because they were witnesses. However, the appellant ultimately left, and Sullivan went to the basement to turn the deadbolt locks on the basement doors. Sullivan said that the incident lasted a "very short" time. Someone called 911, and the police arrived quickly.

Sullivan said that he spoke with Detective Gregory Jennings and told him that the appellant was one of the perpetrators. Thereafter, Sullivan identified the appellant from a photograph lineup.

-4-

On cross-examination, Sullivan said that Wade's house was "very shaded" and that they usually left windows and doors open in the summer to catch cool breezes. On the night of the incident, the main door may have been open and the screen door closed. Sullivan explained that he asked Wade to complete his shower quickly because the appellant was "persistent" and "urgent" about seeing Wade. Sullivan said that the appellant had "very wide eyes, very shaky eyes." He did not recall whether the two men with the appellant had guns but did not think they did. He stated that he was focused on the appellant's gun.

Kourtney Bearden testified that as of July 9, 2009, she and her boyfriend, Sullivan, had been living in a house with Wade and Ford for approximately one month. During that time, the appellant, who was Wade's friend, occasionally came to visit. On one occasion, the appellant was accompanied by two skinny white males, one of whom may have been named Calvin.

On the evening of July 9, Bearden was sitting on the couch in the living room with Sullivan, using her laptop computer. From where she was sitting, she could see the front door clearly. She saw the appellant approach the door, smiling and waving at her. He opened the screen door, stuck his head inside, and asked if Wade was home. Bearden told the appellant to come in and that she would get Wade for him. She walked a few steps down the hall and yelled for Wade. When Bearden returned to the living room, the appellant pointed a small pistol at her. She took a step back, and the appellant told her, "Come on, get in here." Wade and Ford also came into the living room. Bearden noticed that two men, whose faces were covered with bandanas, had come into the house behind the appellant. The men looked at her then walked toward Wade's bedroom.

Bearden said that the victims sat on the couches while the appellant kept a gun pointed at them. The appellant said, "Just stay calm and it will all be over soon, it will be painless." Ford asked the appellant, "Why are you doing this, Angel? I thought we were friends." The appellant did not respond, and Wade became angry. He stood and said, "Why are you doing this? You know you're going to get caught. You're not going to come in here and do this." Bearden, Ford, and Sullivan tried to get Wade to calm down and sit. Ford and Sullivan pulled Wade down on the couch, but Wade immediately stood up and took a few slow steps toward the appellant. The appellant said, "Don't make me do this, man. Don't make me do this." Wade continued approaching the appellant, and the appellant shot him. Wade grabbed his stomach, made a sound, and fell to the floor. Bearden said that she "thought we were all going to die." The appellant kept the gun pointed toward the victims and kicked the front door closed with his foot. After the shot was fired, the two men returned from the bedroom, and the three perpetrators left.

Bearden said that she ran to lock the front door and the downstairs door. She and Ford

-5-

then attempted to aid Wade by putting a towel over his wound. Bearden said that Wade was obviously "struggling." Bearden identified the appellant as one of the assailants.

Bearden said that when the police arrived, they separated the victims and spoke with them. Afterward, the police took them to the police station to give statements. Police later showed her a photograph lineup, from which she positively identified the appellant as one of the perpetrators.

On cross-examination, Bearden said that when the appellant arrived, the main door was open, but the screen door was shut. The appellant asked for Wade, who was in his bedroom with Ford. Bearden walked halfway down the hall and yelled to get Wade's attention. Bearden walked back toward the living room, followed by Ford and Wade. Upon entering the living room, Bearden noticed that the appellant was pointing a gun at them. The appellant "told [them] to stay calm, and just stay there[,] . . . that it would be painless and quick and be over if we just stayed there." Ward was angry that the appellant "was holding [them] at gunpoint and trying to take things." Ward stepped toward the appellant and was approximately five feet away when the appellant shot him.

Amanda Cunningham testified that on July 9, 2009, she was living across the street from the victims. Around 10:30 or 11:00 p.m., she was watching television and heard a loud pop outside. She called the police to report the sound. While she was speaking with the police dispatcher, she walked out her front door and saw three masked men running toward a dark-colored sedan that was parked on the opposite side of the street. The men quickly got into the vehicle and sped away without turning on the headlights. She said the men "took a right and went up a hill to a dead end. And [she] never saw them come back down, so [she did not] know what happened after that." Shortly thereafter, someone ran out of the house the men had just left and yelled that someone had been shot. Cunningham relayed that information to the dispatcher.

On cross-examination, Cunningham said that she thought the person who ran out of the house was female.

On redirect examination, Cunningham stated that the victims' house was next to the house directly across the street from her house. She thought all three men were wearing masks, but she "wasn't paying that close attention." Police arrived within five minutes of her call.

Officer Michael Maclennan testified that around 11:00 p.m., he was dispatched to the scene and arrived at the residence a couple of minutes later. He entered the residence and saw four people in the living room. Ward, who had been shot, was lying on the floor. Someone

had placed a cloth, possibly a towel, over his wound. The ambulance arrived a few minutes later.

Officer Maclennan said that the other victims were "very distraught, crying, [and] hysterical." He tried to talk with one of the female victims, but she was too emotional. He separated the victims and contacted detectives to come to the scene. Officer Maclennan spoke with witnesses, including neighbors, and they consistently said that "there were three people, a dark-colored car." Officer Maclennan broadcast that information to other officers via the police radio then left to look for the suspects. He went to a location "on Linden Green" and spoke to Calvin Pettijohn. Thereafter, Officer Maclennan went to an address on Oak Vale and spoke with the appellant's grandmother.

Detective Jeffrey Jobe testified that patrol officers were already at the scene when he arrived around 11:20 p.m. Wade had been transported to the hospital, but the other victims were on the front porch. They were visibly upset and emotional. Detective Jobe first spoke with Bearden. She identified the appellant as one of the perpetrators and said that the two people with the appellant were white males with masks on their faces. The victims were taken to the police precinct, where they were interviewed by Detective Jennings, and gave full statements.

Detective Jobe said that after the interviews were completed, he went to Linden Green and spoke with two white males. The men agreed to go to the precinct. Detective Jennings interviewed the men, but they never admitted any involvement in the incident.

On cross-examination, Detective Jobe said that he and Detective Jennings arrived at the scene at approximately the same time. Detective Jennings ultimately became the lead detective in the case.

Detective Greg Jennings testified that at 11:00 p.m. on July 9, 2009, he was dispatched to the scene. When he arrived, the house had been cordoned off with crime scene tape, and Ford, Bearden, and Sullivan were standing near the patrol cars at the curb, speaking with Sergeant Blair. Detective Jennings spoke with the witnesses and asked if they knew the identity of the perpetrators. Each of the witnesses identified the appellant as the shooter. The witnesses also stated that the appellant was accompanied by "two skinny white males [who] had masks on."

Detective Jennings said that Ford thought the appellant and a man named Calvin, whom Detective Jennings knew, lived on Linden Green and that the appellant's grandmother lived "a couple of streets over from Hermitage Ridge." Sergeant Blair later drove Ford to Linden Green, and she pointed out the appellant's residence. After having the location

confirmed, Detective Jennings went to the residence and knocked on the front door. Calvin Pettijohn answered the door and told Detective Jennings that the appellant did not live there. At Detective Jennings's request, Pettijohn's roommates, Roy Stanley and Corey Daily, stepped outside onto the porch. They were "skinny white males" who were "covered with tattoos." Each man was shirtless and wearing gym shorts. They were "sweating pretty profusely" even though the weather was not hot. Pettijohn, Stanley, and Daily all denied knowing the appellant's whereabouts. Detective Jennings said that Stanley and Daily were the appellant's "running buddies"; the police did not, however, have sufficient evidence to arrest them for any involvement in the instant crimes.

Thereafter, Detective Jennings went to the appellant's grandmother's house. She said she last saw the appellant earlier that afternoon. Detective Jennings returned to the scene and asked Ford, Bearden, and Sullivan to go to the police station to give statements. While at the station, Bearden and Sullivan picked out the appellant's photograph from a lineup. Ford was too upset to look at a photograph lineup at that time, but a few days later, she also identified a photograph of the appellant.

Detective Jennings said that on July 10, he obtained a warrant for the appellant's arrest. Shortly thereafter, the local television news reported that the police needed to speak with the appellant as "a person of interest." On July 13, the appellant turned himself in to the police.

Detective Jennings noted that the police had never found the weapon used to shoot Ward.

Crime Scene Investigator George Bouton testified that he and other officers were dispatched to process the scene. Wade had already been transported to the hospital, but Ford, Bearden, and Sullivan were at the house when Investigator Bouton arrived. He asked the victims to describe the events as specifically as they could. Investigator Bouton found a spent nine millimeter shell casing just inside the door, indicating that the bullet had been fired by a semi-automatic or automatic firearm. He found no weapons in the residence. An open box was found on the bed in the bedroom. Investigator Bouton was unable to find any fingerprints or DNA belonging to the perpetrators in the residence.

Dr. Adele Lewis, an expert in forensic pathology, testified that she performed an autopsy on Wade's body. Her examination revealed that the hospital had undertaken efforts to save his life. Wade had suffered a gunshot wound to the upper right side of his abdomen. Dr. Lewis said that she was unable to tell the distance from which the shot was fired but that it appeared to have been from more than two or three feet. The projectile did not exit the victim's body. The bullet entered the liver and injured the vena cava, which is a "very large

-8-

blood vessel." The injuries ultimately led to the victim's death.

The appellant chose not to put on proof.

The jury found the appellant guilty of felony murder, second degree murder, attempted especially aggravated robbery, and three counts of aggravated assault. The trial court merged the second degree murder conviction into the felony murder conviction and imposed a sentence of life imprisonment. The appellant was sentenced to eleven years for the attempted especially aggravated robbery conviction and five years for each aggravated assault conviction. The court ordered the five-year sentences to be served concurrently with each other but consecutively to the life sentence for a total effective sentence of life plus five years. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's denial of his motion for a judgment of acquittal, the trial court's permitting witness testimony about prior acts of the appellant, and the trial court's failure to allow counsel to withdraw.

## II. Analysis

A. Sufficiency of the Evidence

First, we will address the appellant's challenge to the sufficiency of the evidence. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is

based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant has also challenged the trial court's denial of his motion for a judgment of acquittal. However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction . . . ." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the appellant's complaint as a challenge to the sufficiency of the evidence.

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Further, a criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

In the light most favorable to the State, the proof adduced at trial revealed that the appellant went to the victims' residence and asked to see Wade. When the four victims gathered in the living room, the appellant pointed a gun at them while his two masked

accomplices ransacked the house. The victims pleaded with the appellant to stop threatening them but to no avail. Wade stepped toward the appellant, and the appellant shot him in the abdomen. After the shot was fired, the appellant and his accomplices ran from the house. Ford, Bearden, and Sullivan identified the appellant as the shooter. Wade died as a result of the gunshot wound. After the shooting, Ford noticed that Wade's coin collection, wallet, and cellular telephone as well as Ford's iPod and forty dollars in cash were missing from their bedroom.

On appeal, the appellant argues that no physical evidence, such as DNA or fingerprints, connected him to the crimes. As the State notes, however, three eyewitnesses positively identified the appellant as the shooter. The appellant also contends that the testimony of the eyewitnesses was contradictory and that their memories of the events were impacted by the length of time between the incident and the trial. The State responds that the jury heard the eyewitnesses and, as was its prerogative, accredited their testimony. We agree with the State. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). We may not now reassess the jury's credibility determinations. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

Finally, regarding the robbery conviction, the appellant contends that the State did not produce any evidence that he took any property or that robbery was "a motive for his presence at the residence." The State responds that "holding a gun on the victim while one's companions are taking property from the victim's home is sufficient evidence from which a jury could infer guilt of robbery." We agree with the State.

Based upon the foregoing, we conclude that the proof adduced at trial was sufficient to sustain the appellant's convictions of felony murder, attempted especially aggravated robbery, and aggravated assault.[1]

## B. Rule 404(b)

The appellant's next two issues concern the admission of character evidence. Prior to trial, the appellant filed a motion in limine, asking the trial court to caution the witnesses "to confine their testimony to that which is responsive to the questions asked" and "not to volunteer information regarding past bad acts of the [appellant]." The motion did not specify the bad acts that were of concern to the appellant. Regarding this motion, the trial court said:

---

[1]On appeal, the appellant did not challenge the sufficiency of the evidence underlying his aggravated assault convictions.

I am sure both sides will try to, as admirably as they can, to get the witness to comply with what – to answer the questions asked. But, you know, people blurt out all kinds of things and if that happens an[] objection should be made and I will deal with that.

Despite these precautionary measures, prior acts related to the appellant's criminal history were inadvertently referenced by three witnesses during trial. First, during cross-examination Ford stated that the appellant "was acting angry, like he was going to rob us and kill us." At that point, the following colloquy occurred:

[Defense counsel:] Had you ever seen him act like that before?

[Ford:] No.

[Defense counsel:] In all of the times you had seen him?

[Ford:] No.

[Defense counsel:] So that was abnormal, then?

[Ford:] I'd heard stories from the past, where he had –

At that point, the trial court interjected, "Well, let's not get into that, okay?" Ford agreed and stated, "I had never seen him like that."

Next, during cross-examination of Sullivan, defense counsel asked, "You don't recall if [the accomplices] had weapons or not, you were mainly focused on [the appellant]. Is that a fair statement?" Sullivan responded:

Yes. I don't recall if they had weapons, but I don't think they did. I had heard – [the appellant], in the past, had talked about a previous gun crime he had. And once I saw that he had a gun and put his old stories together, it was very clear to me that that was serious.

Sullivan continued to testify without objection and without any further mention of the appellant's "previous gun crime." Immediately following the conclusion of Sullivan's testimony, court ended for the day.

The next morning, during a jury-out hearing, defense counsel complained that during Sullivan's response to counsel's questions, Sullivan had volunteered additional information about the appellant's criminal history. Defense counsel said he did not object immediately because he did not want to call undue attention to the testimony. Nevertheless, he said, "I just wanted to put that on the record, that I was objecting to that information coming in." Defense counsel specifically stated that he did not want a curative instruction, which he feared "would, probably, just ring the bell even more." Instead, he moved for a mistrial but indicated that he was unsure if the motion was "appropriate." The State responded that "[i]t was a very fleeting, passing reference, that I suspect went over the heads of most anybody" and that a curative instruction would only draw further attention to the statement. The State further contended that a mistrial was not warranted.

The trial court acknowledged that the statement about the appellant's criminal history could be overlooked easily, noting, "I may have missed it myself." The court observed that "these are the kinds of things that come up in trial. We cannot control what people say. We do the best that we can, but things are blurted out, periodically, in any trial." The court noted defense counsel's objection but overruled it. Additionally, the court denied the motion for a mistrial.

Finally, during direct examination, the State asked Detective Jennings whether the police were able to determine if the appellant had a car. Detective Jennings began his answer by saying, "He had been arrested in the past . . ." The State interrupted, saying, "I'm sorry." The court cautioned the detective, "Don't get into that." The court did not give a curative instruction following any of the references.

On appeal, the appellant argues that the trial court erred by allowing the witnesses to testify about the appellant's character and that the court "failed to properly act" when the references to the appellant's character were made. The State responds that the trial court did not "allow" the testimony. Further, the State notes that the appellant did not request curative instructions and that the "brief improper references" did not affect the trial. We agree with the State.

At trial, the appellant did not make a contemporaneous objection to the testimony; instead, he waited until the following day and requested a mistrial. Further, the appellant failed to raise the denial of his motion for a mistrial as an issue in his motion for new trial or on appeal, thereby waiving the issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

-13-

Nevertheless, we note that the remedies available to the trial court were few: to grant a mistrial, to give a curative instruction, or to let the references pass without further comment. Generally, a mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The trial court found that the references were so fleeting that a mistrial was not warranted. We conclude that the trial court did not abuse its discretion by denying the request for a mistrial.

Further, we note that Ford's mention of the appellant's "past" came about during repeated questioning by defense counsel. Moreover, as noted by the State, defense counsel did not contemporaneously object to the testimony of any of the three witnesses and specifically stated that he did not want a curative instruction for fear it would "ring the bell even more." See Tenn. R. App. P. 36(a). The trial court agreed and "reasonably concluded that any instructional remarks . . . would only call prejudicial attention to the otherwise relatively innocuous testimony." State v. Thomas Alvin Carter, No. E2005-01163-CCA-R3-CD, 2006 WL 1544540, at *4 (Tenn. Crim. App. at Knoxville, June 7, 2006). Therefore, the trial court was left with only one recourse: to let the references pass without further comment. We conclude that the trial court did not abuse its discretion in this regard. Id.

### C. Withdrawal of Counsel

Finally, the appellant contends that the trial court erred by failing to grant defense counsel's motion to withdraw. On January 31, 2013, prior to the appellant's trial, defense counsel filed a motion to withdraw and to continue the trial. In the motion, counsel averred that the appellant's mental health issues had reoccurred and that a mental health assessment that should have been completed in the latter part of 2012 had not been completed. Counsel further stated that "[t]he attorney/client relationship has come to a point where further representation is not possible . . . ." The appellate record contains a minute entry that states the motion was heard by the court and that "after due consideration and all the evidence introduced," the court denied the motion. Neither a transcript of the hearing on the motion nor a written order denying the motion, however, were included in the record on appeal.

Generally, "[t]he decision whether to allow counsel to withdraw in a pending criminal matter is vested in the sound discretion of the trial court, and the decision will not be reversed on appeal unless an abuse of discretion is shown." State v. Russell, 10 S.W.3d 270, 274 (Tenn. Crim. App. 1999); see also Tenn. Code Ann. § 40-14-205(a) ("The court may, upon good cause shown, permit an attorney appointed under this part to withdraw as counsel of record for the accused.").

On appeal, the appellant contends that he "made it clear on multiple occasions that he wanted trial counsel discharged." He further contends that "trial counsel's good cause to seek relief from the case was the attorney-client communications had broken down so seriously that adequate trial preparation was impossible." The appellant asserts, therefore, that the trial court abused its discretion by denying counsel's motion to withdraw. In response, the State maintains that the appellant failed to meet his burden of showing the trial court abused its discretion. We agree with the State.

As the State notes, the record on appeal does not include a transcript of the hearing on the motion to withdraw or the trial court's written order denying the motion. The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Ordinarily, "[i]n the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Because of the inadequacy of the record before us, we must assume the trial court did not abuse its discretion by denying the motion to withdraw.

## III. Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE